ROYAL EXCHANGE ASSUR. OF LONDON, ENG., v. ROSBOROUGH.

(Court of Civil Appeals of Texas. Texarkana. Dec. 28, 1911. Rehearing Denied Jan. 4, 1912.)

INSURANCE (§ 335*)—CONDITIONS—PERFORMANCE.

Insurance certificates covering cotton in storage required the insured to keep a set of books showing a complete daily record of the date at which each bail of cotton covered was purchased or received, from whom purchased or received, in what warehouse, compress, or yard stored, together with the original tag number or mark thereon with its weight and classification, and a complete daily record of all shipments, or sales, etc. *Held* that where plaintiff's record showed no classification of the cotton covered except as the same might be ascertained from the price per pound paid therefor in connection with the market price on the day of the purchase, and the custom of price variation above or below market as the cotton was above or below middling grade, there was no sufficient compliance with the provision requiring classification, which precluded a recovery on the policies.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 853; Dec. Dig. § 335.*]

Levy, J., dissenting.

Appeal from District Court, Harrison County; W. C. Buford, Judge.

Action by W. J. Rosborough against the Royal Exchange Assurance of London, England. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

Crane & Crane, for appellant. S. P. Jones, for appellee.

LEVY, J. Appellant had issued to appellee its several certificates of insurance covering cotton in bales owned or held by him, or sold but not delivered, while in L. J. Womack's cotton yard in Marshall, Tex. The certificates each had the following provision: "And the assured under this policy hereby covenants and agrees to keep a set of books showing a complete daily record of the date at which each bale of cotton covered under this certificate was purchased or received, from whom purchased or received, in what warehouse, compress or yard stored, together with the original tag number or mark thereon, with its weight and classification, and a complete daily record of all shipments or sales, showing to whom shipped or sold, with date of shipment, from what warehouse, compress or yard so shipped, and the original tag number or mark, weight and classification of each bale, and in case of loss the assured agrees and covenants to produce such books and records, and in the event of failure to produce the same this certificate shall be null and void." The cotton was destroyed by fire on March 8, 1910. In answer to the suit for loss, the appellant pleaded a breach of this stipulation and condition in failing to have a set of books showing "classification" of the cotton destroyed. The conclusion having been reached that this pleading of appellant was fully proven in the trial, and the certificates were avoided, no more of the pleading or questions on appeal need be set out or discussed.

By proper assignments appellant contends that it conclusively appears from the evidence that the appellee did not keep a book showing the "classification" of the cotton destroyed, and the certificate by its terms was therefore avoided. It was proven, and not here denied, that appellee kept a book showing the entries of his cotton transactions. It is admitted here that the entries, except as to "classification," were in compliance with the terms of the stipulation. It is unnecessary to set out the long list of entries in the book as each entry appears similarly, varying only according to its data, on which it is founded. An idea of the form and contents of the book can be gotten from what is here given. The book on the first line shows, in separate columns and on a parallel line: "L. J. Womack's cotton yard, 1909, September 23, J. J. Lea, B, 82, 515, 12–60, 64.90, 1910, March 3, Sold to Merrifield Zeigler & Co., Dallas, Texas." It was explained: That "L. J. Womack's cotton yard" meant and referred to the place where the cotton was stored. That the first-mentioned dates were the year, month, and day of the month that each bale was purchased. That the names first mentioned were the persons from whom

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

each bale of the cotton was purchased. The letter "B" and figures "82" were used as serial yard numbers of the bales. The "515" was the weight of the bale of cotton. The "12-60" was the price per pound paid. The "64.90" was the total amount paid for the bales. The remaining entries above were the name of the persons that such bales of cotton were sold to by appellee, and the date of the sale, and place where the purchaser lived. Appellee further testified, in reference to the entry of the price per pound paid: "From this cotton book the entry of the classification of the individual bale of cotton is only as the price would indicate. There are no actual letters or marks of classification. I know the range of classification that this 770 bales of cotton embraced, and four or five grades would cover the entire list. The basis of the prices that I paid for this cotton was governed by the basis of middling cotton, and we had quotations every hour from New York and New Orleans and Liverpool, and the openings and closing of the markets there for me to determine from day to day what middling cotton was worth. Those quotations were upon middling cotton. I determined what to pay for 'ordinary' cotton by taking the quotation on 'middling' and base it on the differentials—the differentials on grades. And on the grades lower than 'middling' this basis runs on a scale downward, and on a scale upwards on the higher grades than middling. That differential differs in different seasons. But the season in which this cotton was purchased there was a recognized scale of differentials. In the absence of a mark of classification upon my book, I could approximately tell the classification of a particular bale of cotton from the entries on my book. With the aid of the market reports of the various days I could tell it. There is no infallible rule of classification. It depends on the judgment of the buyer as to the classification. The buyers do not always agree on the classification, and it is a pretty hard matter to get them to agree on that many bales. If you were to take a half dozen samples to half a dozen buyers, they won't all agree on the same classification of it. I know it." On cross-examination he testified: "Cotton was fluctuating in price during the season I bought, as it usually does. It was not the same price every day that I purchased for the same grade. I have stated that there is nothing in my cotton book or any book kept by me which shows the grade of the cotton, except as I may be able to infer it from the price paid. There is no statement that it is ordinary, low ordinary, or any other grade. I did not say that there were several grades of cotton grown and marketed at Marshall last season. It would be hard for me to say just how many different grades were marketed. I can tell you about the grades I purchased and sold. To the best of my judgment five grades would cover everything that I

handled. Those five grades were strict low middling, middling, strict middling, good middling, and strict good middling. The prices for those grades of cotton would vary differently for the different grades on different days. On the same day the correct difference in the price of the different grades would be: For instance, taking middling as the basis, strict middling would be worth one-eighth cent per pound more than middling, good middling one-fourth cent more than middling, and strict good middling one-half cent more. On different days those prices vary; as, for instance, middling would be sold for the price of low middling, and strict middling for the price of middling. In buying cotton I did not infrequently follow my own wishes and go beyond the market price. That was my custom on an advancing market, and I was an individual buyer and took my prices from no one, except, of course, I took my basis from the reports that I had. But it did not infrequently happen that I would give a little beyond the market price, and those prices I paid I would enter in that book. I would have to have the market reports to even approximate the grades of the cotton purchased from the entries made on the book. I might be able to tell approximately by the whole market reports before me what dates I guessed that the market would advance, but my book won't indicate that." On redirect examination he testified: "In reference to what I said about my sometimes purchasing a little above the market, I never did play the market very strong. Sometimes I paid as high as one-eighth more than really the market would justify, and when I did that it was for customers' cotton that owed me." This is all the evidence in the record in respect to the question of classification.

Recurring to the provision of the certificate, it is provided that the insured shall "keep a set of books showing a complete daily record" of the several things enjoined to be done to accomplish the objects sought. The clause is a promissory warranty, and the appellant has the right to insist upon at least a substantial compliance with its provisions. The contention that the book failed to show any "classification" of the cotton involves an admission, and is not in fact to the contrary, that the evidence showed a compliance as to the several other things required to be recorded. But by the proper interpretation of the penalty words in this provision, if any one thing required to be done failed, forfeiture would ensue, notwithstanding a compliance as to the several other things. So by contract of the parties each thing to be recorded must be "a complete daily record," or forfeiture will ensue. It is to be understood that "classification," as applied to cotton, means and refers to the grade of the cotton. Cotton is classified as "middling," "low middling," etc. The thing, therefore, appellee undertook to do, was to

keep and deliver to appellant, in the event of a loss of the cotton by fire, a book showing, among other things, which one of the bales of cotton insured was "middling," "low middling," and the like. A proper way to have kept the book undoubtedly would have been to have entered therein opposite each bale, according to the classification that the insured might give it at the time, that it was "middling," "low middling," and the like. It could not, we think, properly be said, however, that there is no other proper method or way the book could have been kept so as to show classification other than by entering therein the words "middling," "low middling," and the like, as indicating same. The evidence fully shows that in cotton dealing there is a universal system of issuing daily general market quotations of the market price per pound payable for cotton for the particular day, and that such quotations are followed and observed generally in buying cotton. The market price per pound payable is fixed by an established system of differentials based on "middling," it appears, and by the quoted market price per pound of a given day the grade of the particular bale purchased on that day can be reasonably and certainly determined and known. The market price per pound payable indicates the grade, and is a system used in quoting market prices to indicate the grade of the cotton. So if it can be said to appear from the evidence that appellee paid each day the market price per pound payable for cotton for each of the bales of cotton purchased, and, for the purpose of indicating the classification, had entered on the book the market price per pound he paid, instead of the words "middling," "low middling," and the like, the conclusion would be warranted, we think, that there had been entered a classification in compliance with the warranty. In that case whether a given bale was "middling," "low middling," and the like, could reasonably and certainly have been determined by reference to the customarily and regularly issued general market quotations of the price of cotton on the day it was purchased. Such entries might well have been said to be sufficient and full enough to show a "classification" of the cotton and to satisfy the requirement of the provision. Chief Justice WILLSON, though, is of the opinion that it does not appear from the evidence that appellee paid the market price for each of the bales of cotton, nor did it appear that the entries made by him in the book of the prices paid for the cotton purchased were intended to indicate his classification thereof. It must be said to appear to the contrary, he thinks, as appellee testified that not infrequently the prices he paid and entered in the book were not the market prices of the cotton purchased. It is obvious, if the prices entered in the book in some instances did not represent the market prices, that appellant could not by a reference to market prices on the dates of the entries or otherwise have determined the classification of the cotton. In consequence, the book kept by appellee not only did not show classification of the cotton, as stipulated for, but it did not furnish data which made it possible for appellant with reasonable certainty to ascertain its classification. Therefore, upon the preceding statements, he is of the opinion that it cannot be said that the evidence made an issue as to whether or not there had been a compliance, substantial or otherwise, with the warranty. He thinks the evidence shows that there was no compliance with the provision in hand, nor any attempt to comply with it, and a forfeiture ensued. The writer of the opinion thinks the evidence does here make an issue of fact as to substantial compliance. Justice HODGES, however, is of the opinion that, in view of the fact that the liability of the appellant must be determined by the market value of the cotton at the time the loss occurs, the requirement that the insured shall keep a book which, among other things, should show a complete daily record of the classification of the cotton to be covered by the policy, could have but one meaning, and that is that the record thus required should disclose to which one of the different grades into which cotton is grouped in the markets each bale belonged. An entry of the grade becomes a record that is self-evident, and not dependent upon deduction from any other fact, and therefore complete on its face to appellant or any one else. If the grade be not entered, as here, then upon the trial the evidence for which the insurance company contracted is wanting, and instead they must take the testimony of the insured as to what the classification was, and he can only testify upon the question by referring to the prices he paid. The insurance company would therefore be compelled to settle by his oral testimony as to what the grade of the cotton purchased was, and not by the written record which it stipulated should be kept and produced to it. The price paid for cotton when purchased in the daily market is as easily preserved and recorded as any other feature connected with the transaction; and, had the appellant desired that a record be kept of the price, it could as easily have stipulated for that as it did for the preservation of a record of the class to which the cotton belonged. Not having done this, he can see no reason why it should be compelled to accept a substitute for that which it had contracted for. It is his conclusion, founded upon the statements preceding, that there was no compliance with the terms of the provision in the keeping of the classification covenanted for, and that for that reason the certificates should be held void.

It being the opinion of the majority of the court that the assignment should be sustained, and it finally disposing of the appeal,

the judgment should be reversed and here rendered in favor of appellant with all costs, which is accordingly ordered.

Continuing his view, the writer does not think that, because it appears that appellee made some entries in the book of prices that were not the actual market prices, the court would be warranted in holding, as a matter of law, that there was a want of any compliance or intention to comply with the provision as to a "complete" record showing classification of the cotton. He did testify, in cross-examination, that not infrequently the prices he paid and entered in the book were not the market prices of the cotton purchased. But in his redirect examination he explains the frequency as follows: "In reference to what I said about my sometimes purchasing a little above the market, I never did play the market very strong. Sometimes I paid as high as one-eighth more than really the market would justify, and when I did that it was for customers' cotton that owed me." And that is the extent of the evidence as to frequency or infrequency of the entries so made. How many entries were thus made does not appear. Giving the explanation of the appellee the force that it reasonably should have, it could not be said that the evidence conclusively shows that any considerable number of such entries were made. If his statement that he "did not play the market very strong," but "sometimes I paid one-eighth more," could be taken as meaning, as it could, that he made only a few such purchases, and not many, then it would appear that only a few entries, and not many, were made on the book that did not actually represent the market price. And in this connection he stated that he could tell approximately the dates on which he went a little in advance of the market. The book itself was in evidence, and by it there appeared the intention to keep the book as a whole as a compliance with the provision. In fact, it could be said by the book that he kept it for no other purpose than because it was required by the insurance contract. It had no other entries than required by the certificates, and all the entries required, as admitted, if the classification entry constituted compliance in the form entered. If it must be said that there was not a substantial compliance by appellee of the provision to have the entries "complete," it must rest in the indefinite evidence that there were imperfect entries of classification sometimes made in the book. The question as to whether this was a slight and trivial error in keeping the book is presented. It also appears that such imperfect entries consist in being "one-eighth cent more than really the market" allowed. At least in this state of the record the writer thinks it remains as a question for the jury to answer as to whether there was a substantial compliance. The burden of proof to show a want of compliance was on appellant, and this involves the duty to put the jury in possession of all the facts that would show a want of any compliance or substantial compliance. There was not a want of any compliance unless the records were so imperfectly kept as to be incomplete. If there had been enough of such entries to be of consequence not representing market price, the proof was there available. And because there is no evidence to show omissions not trivial or slight, the writer does not think' the court could say, as a matter of law, that it was not a substantial compliance. The jury found that there was a substantial performance.